## UNITED STATES COURT OF INTERNATIONAL TRADE

|  | : |  |
| --- | --- | --- |
| INTERNATIONAL GREENHOUSE PRODUCE, S.A. DE C.V., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Court No. 23-00093 |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## **COMPLAINT**

Plaintiff International Greenhouse Produce, S.A. de C.V. ("Plaintiff" or "IGP"), by and through its attorneys, alleges and states as follows:

1.      Plaintiff seeks judicial review of the final results of the U.S. Department of Commerce ("Commerce") in the second administrative review of the 2019 Agreement Suspending the Antidumping Duty Investigation on Fresh Tomatoes from Mexico ("2019 Agreement"), covering the period September 1, 2020 through August 31, 2021.  *See Agreement Suspending the Antidumping Duty Investigation on Fresh Tomatoes from Mexico: Final Results of the 2020-2021 Administrative Review*, 88 Fed. Reg. 15,375 (Dep't of Commerce Mar. 13, 2023) ("*Final Results*"), and accompanying Issues & Decision Memorandum ("IDM"); *see also Fresh Tomatoes from Mexico: Suspension of Antidumping Duty Investigation*, 84 Fed. Reg. 49,987 (Dep't of Commerce Sept. 24, 2019) (suspension agreement).

## JURISDICTION

2.      Plaintiff brings this action pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) to review final results issued by Commerce under 19 U.S.C. § 1675.  The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1581(c).

## STANDING

3.      Plaintiff is a producer and exporter of fresh tomatoes from Mexico and, thus, meets the definition of an "interested party" within 19 U.S.C. § 1677(9)(A).

4.      Plaintiff participated in the underlying administrative review giving rise to this action and, therefore, constitutes "a party to the proceeding in connection with which the matter arose" under 19 U.S.C. § 1516a(a)(2)(A).

5.      As an interested party who participated as a party in the underlying proceeding, Plaintiff has standing to commence this action pursuant to 19 U.S.C. § 1516a(d) and 28 U.S.C. § 2631(c).

## TIMELINESS OF THE ACTION

6.      Commerce published notice of the *Final Results* in the *Federal Register* on March 13, 2023.

7.      Plaintiff timely filed its Notice of Intent to Commence Judicial Review pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii), (g)(3)(B), and Article 10.12 of the U.S.-Mexico-Canada Agreement on April 3, 2023.

8.      Plaintiff timely filed its Summons for this action on May 8, 2023, consistent with the time period specified in 19 U.S.C. § 1516a(a)(2)(A)(i)(I), (a)(5)(A), (g)(3)(A)(i), and (g)(3)(B).

9.      Plaintiff timely filed this Complaint within 30 days of the filing of its Summons, as required by the time limits set forth in 19 U.S.C. § 1516a(a)(2)(A) and Rule 3(a)(2) of this Court.

10.     Plaintiff has therefore timely commenced this action pursuant to 28 U.S.C. § 2636(c).

## **PROCEDURAL HISTORY**

11.     On September 17, 2021, the Florida Tomato Exchange ("FTE") requested that Commerce conduct an administrative review of all producers and exporters covered by the 2019 Agreement.

12.     On November 5, 2021, Commerce initiated an administrative review of the 2019 Agreement covering the period September 1, 2020 through August 31, 2021.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 61,121, 61,130 (Dep't of Commerce Nov. 5, 2021).

13.     On February 3, 2022, Commerce selected IGP as a mandatory respondent in the subject review.  *See* Memorandum from Steven Presing, Acting Executive Director, to Ryan Majerus, Deputy Assistant Secretary for Policy and Negotiations, "2020-2021 Administrative Review of the 2019 Agreement Suspending the Antidumping Duty Investigation on Fresh Tomatoes from Mexico:  Respondent Selection and Corrected Period of Review" (Dep't of Commerce Feb. 3, 2022).

14.     On September 30, 2022, Commerce issued the preliminarily results of the subject review. *See Agreement Suspending the Antidumping Duty Investigation on Fresh Tomatoes From Mexico; Preliminary Results of 2020–2021 Administrative Review*, 87 Fed. Reg. 60,994 (Dep't of Commerce Oct. 7, 2022) ("*Preliminary Results*"), and accompanying Preliminary Decision Memorandum ("PDM").

15.     In the *Preliminary Results*, Commerce examined IGP's sales through its selling agents (Delta Fresh Sales, LLC ("Delta Fresh") and Malena Produce, Inc. ("Malena")).  In so

doing, Commerce made two novel, preliminary findings relevant here.  These findings directly affected IGP in the subject review and raised significant implications for the industry as a whole.  First, Commerce evaluated IGP's compliance with the requirement to eliminate 85 percent of the dumping calculated in the investigation by comparing each of IGP's 30 lowest-priced sales of Round tomatoes and 30 lowest-prices sales of Roma tomatoes sold in the United States in two months of the period of review to weighted-average normal values (one for Round tomatoes, another for Roma tomatoes) calculated using sales made by IGP to Canada during the entire period of review.  PDM at 10-11.  Commerce based the normal values on IGP's sales to Canada because IGP did not make home market sales during the period of review.  *Id.* at 14.  Despite calculating a large overall negative weighted-average dumping margin, Commerce preliminarily determined that IGP did not comply with the obligation to eliminate 85 percent of dumping found in the investigation as to each and every sale.  *Id*. at 17.

16.    Second, Commerce preliminarily determined that unaffiliated brokers based in the United States and involved in certain IGP sales operated as the first unaffiliated customer in the United States – i.e., as a "Buyer" under the 2019 Agreement.  *See* PDM at 6–9.  Consequently, for such transactions, Commerce evaluated compliance with the 2019 Agreement by examining the transaction between IGP's selling agents and the unaffiliated U.S. broker, regardless whether the selling agents directly shipped the merchandise to the U.S. brokers' customers based in Canada.  Memorandum from Jesse Montoya, International Trade Specialist, to the File, "Preliminary Analysis of Proprietary Information and Argument Regarding International Greenhouse Produce for the Period of Review (POR) from September 1, 2020, through August 31, 2021" (Dep't of Commerce Sept. 30, 2022) ("IGP Memo") at 3.

17.    Commerce's treatment of U.S. brokers, based on its new interpretation of the 2019 Agreement, dictated two other findings in the *Preliminary Results*.  As an initial matter, Commerce improperly determined that certain sales made by IGP's selling agents to customers based in Canada through unaffiliated U.S. brokers should be re-categorized as U.S. sales.  *See* PDM at 6–9; *see also* IGP Memo at 3.  Because Commerce considered the U.S. broker – instead of the U.S. broker's Canadian customer – to be the Buyer in the transaction, Commerce determined that the first sale to an unaffiliated U.S. customer occurred in the United States instead of in Canada.  *See* PDM at 6–9; IGP Memo at 3.  Based on this false premise, Commerce found that certain sales by IGP did not comply with the obligation to eliminate 85 percent of dumping found in the investigation.  *See* PDM at 17–18.

18.    Moreover, as a result of this novel and incorrect predicate finding, Commerce determined that the unaffiliated U.S. broker (and not the U.S. broker's customer) must request any destination inspections that could form the basis of an adjustment pursuant to Appendix D of the 2019 Agreement.  *See id.* at 20; *see also* IGP Memo at 8.

19.    On March 6, 2023, Commerce published the *Final Results*.  *See* 88 Fed. Reg. at 15,375.  Commerce maintained each of the above-described findings as to IGP.  Specifically, Commerce continued to evaluate compliance with the obligation to eliminate 85 percent of dumping found in the investigation by comparing prices of "each and every" U.S. sale (including the improperly re-categorized sales to customers based in Canada) to weighted average normal values.  IDM at 5; *see id.* at 5–8.  Additionally, Commerce continued to determine that unaffiliated U.S. brokers operated as Buyers, such that sales destined for customers based in Canada through such brokers nevertheless constitute U.S. sales.  *See id.* at 9–13.  Finally, as a result of its erroneous reclassification of those sales, Commerce continued to find that only the unaffiliated U.S. brokers

may request a destination inspection that could form the basis of adjustments under Appendix D of the 2019 Agreement.  *See id.* at 18–19.

## **STATEMENT OF CLAIMS**

20.     Paragraphs 1 through 19 are incorporated by reference.

21.     In several respects, Commerce's novel and erroneous determinations in the *Final Results* negatively impact IGP and disrupt more than twenty-five years of settled commercial practices in the industry.

22.     After administering five different suspension agreements based on 19 U.S.C. § 1673c, Commerce in the *Final Results* advanced an entirely new and unlawful interpretation of that statute with respect to the elimination of the requisite amount of dumping.  In so doing, Commerce has forced industry participants to bet their compliance with the 2019 Agreement (and, in turn, the statute) on speculation and estimation.  *See, e.g.*, IDM at 8 ("We agree that all elements of a (retrospective) dumping calculation are not necessarily available contemporaneously during the year.  However, elements of the calculation that are unavailable can reasonably be estimated when considering pricing and estimates may not need to be precise to set prices in real time in a manner that complies with the 2019 Agreement.").

23.     In treating certain transactions involving U.S. brokers as U.S. sales, Commerce altogether jettisoned the definition of "broker" in 7 C.F.R. § 46.27 that the 2019 Agreement adopts and that the U.S. Department of Agriculture ("USDA") first promulgated in the 1960s.  Commerce's decision to ignore this decades-old definition eviscerates the industry's settled understanding of the role of brokers, who have long connected signatories and selling agents to downstream customers without acting as a "buyer" of the subject merchandise.  Indeed,

Commerce's unlawful determination imposes entirely new restrictions on sales of non-subject merchandise to which the signatories never agreed when they negotiated the 2019 Agreement.

24.    In view of this context, and for reasons apparent from the record of the administrative proceeding, Commerce's *Final Results* are not supported by substantial evidence and otherwise not in accordance with law.  *See* 19 U.S.C. § 1516a(b)(1)(B)(i).

**<u>COUNT ONE</u>**

25.    Paragraphs 1 through 24 are incorporated by reference.

26.    In the *Final Results*, Commerce erroneously evaluated compliance with the requirement to eliminate 85 percent of dumping found in the investigation by comparing individual U.S. sales prices to weighted-average normal values.  IDM at 6.

27.    In an administrative review, Commerce "will use the average-to-average method unless the Secretary determines another method is appropriate in a particular case."  19 C.F.R. § 351.414(c)(1).  In other words, Commerce's default approach to calculating a dumping margin in an administrative review is to compare weighted-average U.S. sales prices to a weighted-average normal value.  The text, structure, and final rule underlying Commerce's regulation confirm that the preference for average-to-average comparisons applies equally to administrative reviews of suspension agreements.  *See id*.

28.    Commerce may deviate from the average-to-average method through an analysis that is "highly dependent on the facts of the individual proceeding."  *Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification,* 77 Fed. Reg. 8,101, 8,105-08 (Dep't of Commerce Feb. 14, 2012) ("*Final Modification*").

29.    In the *Final Results*, Commerce departed from the average-to-average method, but not as a result of the record facts.  Instead, Commerce based its unlawful and unsupported decision

on a results-oriented interpretation of "for each entry" in 19 U.S.C. § 1673c(c)(1)(B).  According to Commerce, the phrase "for each entry" and the alleged purpose of 19 U.S.C. § 1673c(c)(1)(B) require it to examine dumping on sale-by-sale basis in an administrative review of a suspension agreement.  *See* IDM at 5–8.  However, in the *Final Modification*, Commerce determined that it would use average-to-average as the default comparison method, notwithstanding the inclusion of that very same phrase in the relevant statutes (i.e., "for each entry" in 19 U.S.C. § 1673d(c)(1)(B) and 19 U.S.C. § 1675(a)(2)(A), respectively) and despite those statutes having the same overall goal of eliminating dumping as 19 U.S.C. § 1673c(c)(1)(B).  *See* 77 Fed. Reg. at 8,107-08.

30.    Commerce's unlawful deviation from the default average-to-average comparison method also conflicts with the structure of the statute and regulations.  The statutory and regulatory provisions that govern administrative reviews (i.e., 19 U.S.C. § 1675(a)(1) and 19 C.F.R. § 351.213), the dumping margin calculation provisions in 19 C.F.R. Subpart D, and the *Final Modification* do not permit Commerce to establish categorically different dumping margin calculation methodologies for administrative reviews of suspension agreements and administrative reviews of antidumping orders.  However, in the *Final Results*, Commerce explained that, because 19 U.S.C. § 1675(a)(1)(C) directs Commerce to "review the current status of, and compliance with," suspension agreements in addition to "review{ing} the amount of any net countervailable subsidy or dumping margin involved in the agreement," Commerce may apply "different methodology" when calculating dumping margins in administrative reviews of suspension agreements.  IDM at 5, 7.  Commerce's *non sequitur* does not support the unlawful interpretation that it adopted.  Indeed, Commerce unlawfully rests its interpretation on an isolated statutory passage (i.e., its obligation to "review the current status of, and compliance with," a suspension

agreement), instead of considering the statute as a whole and how it previously interpreted the operative phrase "for each entry."  *See id.*

31.    Commerce's unlawful departure from the default average-to-average comparison method also imposes an impractical and unlawful "contemporaneous obligation" on IGP (as well as all other signatories) to eliminate the requisite amount of dumping at the time of each sale. Despite acknowledging that "all elements of a (retrospective) dumping calculation are not necessarily available contemporaneously," Commerce unreasonably speculated that IGP "can reasonably {} estimate{}" those unknown elements "when considering pricing."  *Id.* at 8.

32.    Therefore, Commerce's methodology for evaluating compliance with the requirement to eliminate 85 percent of dumping found in the investigation is not supported by substantial evidence on the record and is not otherwise in accordance with law.

## COUNT TWO

33.    Paragraphs 1 through 32 are incorporated by reference.

34.    In the *Final Results*, Commerce erroneously determined that U.S. brokers operated as the first unaffiliated customer in the United States – i.e., as a Buyer under the 2019 Agreement. IDM at 9-13.  As a consequence of this determination, Commerce unlawfully treated certain sales to Canada by IGP's selling agents as U.S. sales.  *Id.*

35.    Commerce's determination conflicts with the terms of 2019 Agreement, which adopts the definition of "broker" that appears in the regulations implementing the Perishable Agricultural Commodities Act ("PACA").  *See* 84 Fed. Reg. at 49,997; *see also* 7 C.F.R. § 46.27. Promulgated in the 1960s by the USDA, the PACA regulations describe two general types of brokers, including "buying brokers" that may purchase tomatoes in their own name.  7 C.F.R. § 46.27(a)–(b).  The 2019 Agreement considers such brokers to be "brokers for a Buyer," rather

than Buyers in their own capacity.  7 C.F.R. § 46.27(b).  Thus, brokers are not Buyers for purposes of the 2019 Agreement.

36.     During the POR, IGP's selling agents worked with U.S. brokers to sell tomatoes to customers based in Canada.  These brokers performed the functions of "buying brokers" outlined in the PACA regulations.  As a result, these brokers acted as "brokers for a Buyer" instead of as a Buyer for these sales.

37.     Accordingly, Commerce's determination that brokers operate as the first unaffiliated customer in the United States – i.e., as Buyers under the 2019 Agreement – was not supported by substantial evidence on the record and was otherwise not in accordance with law.

38.     Even if Commerce properly treated the sales at issue through U.S. brokers as U.S. sales, Commerce's determination conflicts with Appendix E of the 2019 Agreement.  Appendix E of the 2019 Agreement requires that, for tomatoes that enter the United States for consumption and are subsequently re-exported to Canada, signatories and their selling agents must maintain certain sales documentation and Canadian customs documentation to corroborate that the tomatoes were sold to Canada.  *See* 84 Fed. Reg. at 49,998.  Once established as sales to Canada, tomatoes are not required to be sold above the reference price or to contribute to the elimination of 85 percent of dumping found in the investigation.  As demonstrated by more than 2,000 pages of documents requested by and submitted to Commerce, IGP and its selling agents sold tomatoes to Canada and documented the transactions in accordance with Appendix E of the 2019 Agreement.  Consistent with the terms of Appendix E and the expectations of the industry, IGP and its selling agents considered the properly documented sales to Canada to be Canadian sales for purposes of demonstrating compliance with the 2019 Agreement.  However, in the *Final Results*, Commerce erroneously described Appendix E as a mere recordkeeping provision that does not determine

10

whether tomatoes are Canadian sales for purposes of demonstrating compliance with the 2019 Agreement, despite simultaneously acknowledging that Appendix E is determinative of whether Commerce considers certain transactions to be U.S. sales.  IDM at 11.

39.     Because Commerce unlawfully misconstrued and misapplied Appendix E of the 2019 Agreement, Commerce's determination that certain IGP sales to Canada are U.S. sales was not supported by substantial evidence on the record and was otherwise not in accordance with law.

**COUNT THREE**

40.     Paragraphs 1 through 39 are incorporated by reference.

41.     As a consequence of Commerce's erroneous determination in the *Final Results* that U.S. brokers operated as the first unaffiliated customer in the United States – i.e., as Buyers under the 2019 Agreement, Commerce determined that, for sales through such brokers, signatories and selling agents may not grant adjustments pursuant to Appendix D of the 2019 Agreement based on an inspection requested by the U.S. broker's customer.  IDM at 18-19.

42.     For the reasons provided above in paragraphs 33–39, Commerce's determination that U.S. brokers operate as the first unaffiliated customer in the United States – i.e., as Buyers under the 2019 Agreement – was not supported by substantial evidence on the record and was otherwise not in accordance with law.  Because Commerce erroneously treated those U.S. brokers as Buyers, Commerce similarly erred in finding that such brokers' customers could not request a destination inspection that could form the basis of an Appendix D adjustment.

43.     Even if Commerce properly treated the U.S. brokers as Buyers, substantial evidence does not support Commerce's conclusion that only such brokers could request an inspection that forms the basis of an Appendix D adjustment.  In the *Final Results*, Commerce properly acknowledged that "Appendix D allows Buyers to specify the destination of the inspection."  IDM

at 19.  However, Commerce went on to speculate that "IGP's customers (serving as Buyers) are not precluded from requesting an inspection at the warehouse of the downstream customer."  *Id.* Commerce reached that conclusion by ignoring the commercial realities of the industry, including the sales it reclassified as U.S. sales.  For example, Commerce does not explain how a U.S. broker could request an inspection when the downstream customer is based in Canada.

44.    Accordingly, Commerce's determination is not supported by substantial evidence on the record and is not otherwise in accordance with law.

### PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court (1) hold that Commerce's final results in the subject review are unsupported by substantial evidence on the record and otherwise not in accordance with law; (2) remand the review to Commerce for disposition consistent with any orders and opinions of this Court; and (3) provide such other relief as this Court deems just and proper.

Respectfully submitted,

Yujin K. McNamara
Devin S. Sikes
Paul S. Bettencourt
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006

Dated:  June 6, 2023

*Counsel to Plaintiff International Greenhouse Produce, S.A. de C.V.*

## CERTIFICATE OF SERVICE

I, Yujin K. McNamara, hereby certify that on June 6, 2023, copies of the foregoing Complaint were served on the following parties by certified mail, return receipt requested:

Douglas Glenn Edelschick
U.S. Department of Justice
Commercial Litigation Branch – Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044

Ayat Mujais
U.S. Department of Commerce
Office of Chief Counsel for Trade Enforcement and Compliance
1401 Constitution Avenue, NW
Suite 3622
Washington, DC 20230

Robert Charles Cassidy, Esq.
Cassidy Levy Kent (USA) LLP
900 19th Street, NW
Suite 400
Washington, DC 20006

/s/ Yujin K. McNamara
Yujin K. McNamara